## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| CURTIS LLOYD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:10-cv-1103-MEF |
| | ) | (WO—Publish) |
| HOUSING AUTHORITY OF THE CITY | ) | |
| OF MONTGOMERY, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

### I. INTRODUCTION

Curtis Lloyd filed suit against his former employer, the Montgomery Housing Authority (MHA), claiming disability discrimination and retaliation for reporting sexual harassment. Now the case comes before the Court on two motions filed by the MHA. The first is a Motion to Strike (Doc. # 35), which is due to be GRANTED IN PART and DENIED IN PART. The second is a Motion for Summary Judgment (Doc. # 29), which is due to be GRANTED.

### II. JURISDICTION AND VENUE

This Court has jurisdiction over Lloyd's claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights). The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b). The Court finds adequate allegations supporting both contentions.

1

### III. LEGAL STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). And a genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir.

2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Indeed, a plaintiff must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex,* 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ. P. 56(c).

## IV. THE RELEVANT FACTS

### A. Background—The MHA and Curtis Lloyd's employment

In 1988, Curtis Lloyd began working at the Montgomery Housing Authority (MHA) as a maintenance man. (Lloyd Dep. 16.) Lloyd received generally positive performance evaluations and a number of pay increases during his time there. (*Id.* at 42–43.) He even received a promotion from maintenance man to maintenance mechanic. (*Id.* at 20.)

The MHA operates eight public housing communities and uses a similar structure

for managing all of them. (Dawkins Dep. 7.) Each location has a property manager who reports to Melinda Dawkins, the Public Housing Director. (*Id.*) Maintenance personnel, like Lloyd, report to the property manager at his or her respective location. The MHA also has a Human Resources Manager, Shannell Hardwick, who reports to Evette Hester, the MHA's Executive Director. (Hardwick Dep. 9; Hester Dep. 9.)

Over time, Lloyd worked at about five of the MHA's eight locations. (Lloyd Dep. 18.) This included a stint at Smiley Court starting sometime in 2005 and ending about two years later. (*Id.* at 23–24.) At some point, the MHA moved Lloyd from Smiley Court to Gibbs Village West, another one of the MHA's properties. (*Id.* at 24.) He worked at the Gibbs Village West location until July 2010. (*Id.*)

### B. Lloyd's harassment complaint

While working at Gibbs Village West, Lloyd heard a rumor about him allegedly having an affair with Amanda Bell, his direct supervisor and the property manager there. (Lloyd Dep. 146.) Lloyd thought that Cedric Cleveland, a coworker, made up the rumor about him and Bell out of jealousy. (*Id.* at 123–24.) Then after attending a sexual harassment course, Lloyd reported Cleveland's supposed rumormongering to Hardwick and Dawkins. (Lloyd Dep. 122–23; Dawkins Dep. 9–10; Hardwick Dep. 15–16.) He told Hardwick and Dawkins that some tenants and his aunt said that Cleveland started the rumor about he and Bell having an affair. (Dawkins Dep. 10; Hardwick Dep. 15–16.)

Cleveland denied spreading the rumor. (Hardwick Dep. 18–19.) And this denial

tied Hardwick's hands: she had to tell Lloyd that, although she would look into it, she would have a hard time proving Cleveland's responsibility for the rumor. (Hardwick Dep. 19; Lloyd Dep. 147–48.) During her investigation, Hardwick spoke with a number of people, including Cleveland, Bell, and the tenants that allegedly heard the rumor. (Hardwick Dep. 19.) Cleveland told Hardwick that he had overheard a telephone conversation between Lloyd and an unidentified woman; this conversation suggested to him that Bell had visited Lloyd's house. (Hardwick Dep. 21; Cleveland Dep. 15, 19–20.) Cleveland also told Hardwick that he had heard tenants chatting about a potential relationship between Lloyd and Bell. (Cleveland Dep. 17.)

Bell, during an interview with Hardwick, denied having a personal relationship with Lloyd. (Hardwick Dep. 23; Bell Dep. 9.) Bell said only that she heard about the rumor from Lloyd when he told her that Cleveland had started it. (Hardwick Dep. 23; Bell Dep. 9.) At this point, Bell gave Hardwick the names of the two tenants who Lloyd said told him about the rumor. (Hardwick Dep. 23–24; Bell Dep. 10.) Hardwick then interviewed both tenants—one denied any knowledge of the rumor while the other said she heard it from someone other than an MHA employee. (Hardwick Dep. 28–29.)

Having concluded her investigation, Hardwick had no proof that Cleveland started any rumor about Lloyd. (Hardwick Dep. 31–32.) Nor did she find that Lloyd did anything wrong when it came to how he handled the matter. (*Id.* at 32.) Yet, because the rumor existed, Hardwick recommended in her written report that the MHA separate

5

Lloyd and Bell:

> . . . Mr. Lloyd & Ms. Bell are both of legal age, unmarried &
> consenting adults. However, the subordinate/supervisor
> relationship that exists between them would leave MHA
> exposed, if it does become evident that the rumor is fact-
> based. Furthermore, Mr. Cleveland did not appreciate being
> transferred from a property where he worked hard to get a
> high REAC score to one that didn't perform as well; this fact,
> also, would place MHA in a compromising situation if [it]
> does become evident that the rumor is fact-based. In a
> proactive move to soften the basis of any litigation that could
> arise out [of] this situation, I strongly recommend the
> immediate transfer of Mr. Lloyd or Ms. Bell to another
> property to remove the threat of any Quid Pro Quo or
> retaliation claim that may arise.

(Hardwick Dep., Ex. 4.) As alluded to by Hardwick in her report, the MHA had recently

transferred Cleveland from the Gibbs Village West location to another MHA property.

(Hardwick Dep. 22; Cleveland Dep. 31.)

### C. Lloyd's transfer and resignation

Following Hardwick's recommendation, Dawkins decided to transfer Lloyd.

(Dawkins Dep. 8–9.) She swapped him with Tommy Duncan, the maintenance man at

Smiley Court. (*Id.* at 9; Bell Dep. 12.) Dawkins took this tact instead of transferring Bell

because Bell was the only property manager at Gibbs Village West. (Dawkins Dep. 45.)

Lloyd, moreover, had worked at Smiley Court before and had some familiarity with the

tenants there. (*Id.* at 37.) Besides the change in location, Lloyd's job at Smiley Court was

the same as his job at Gibbs Village West: he had the same hours, pay, benefits, and

responsibilities. (Lloyd Dep. 76.)

Bell delivered the news to Lloyd about his transfer, telling him on Thursday, July 15, 2010, to begin reporting to his new location starting the following Monday. (Lloyd Dep. 58, 60; Bell Dep. 12.) Lloyd asked why the MHA decided to transfer him; Bell responded by saying that Dawkins had made the decision. (Lloyd Dep. 60.) Lloyd then told Bell he did not want to work at Smiley Court because the chicken plant next door made him sick and because he previously had run-ins with tenants who had threatened him. (*Id.* at 61.) Lloyd had never complained about these problems before, not even when he worked at Smiley Court. (Dawkins Dep. 44; Lloyd Dep. 172–73.) Bell said nothing in response to the concerns raised by Lloyd. (Bell Dep. 62.)

Lloyd called in sick on Friday, July 16—the day after his discussion with Bell. The following Monday he called Bell and said that he did not "feel it's right, me being transferred and I haven't done anything." (Lloyd Dep. 63–64.) Bell once again said that it was Dawkins' and Hardwick's decision. (*Id.* at 63–64.) After this discussion, Lloyd met with Dawkins[1] and gave her a handwritten note and asked her to read it:

> This is a sworn statement by Curtis J. Lloyd. Do [sic] to my health with asthma for almost 42 years, working in the Smiley Court area makes me sick, Smiley Court has a chicken house next to it and they burn chicken parts daily. After talking to Mr. BJ McCullugh he also said the plant has very toxic chemicals, and I had [a] run in with tenant [sic] boyfriends [sic] in the past because I wouldn't open their doors, also tenant call me the police because I report things to

---

[1] Dawkins denies ever receiving the note. (Dawkins Dep. 11–12, 17–18.) Because the Court has to view disputed facts in the light most favorable to the plaintiff, the Court will assume (but not decide) the correctness of Lloyd's version of the facts.

> the manager. For this reason I wouldn't like to work in
> Smiley Court because of health and safety reason[s]. I would
> like to work in Patterson Court because it is close to my child
> [sic] school and home will save MHA travel payment on
> emergency calls.

(Lloyd Dep., Ex. 1.)

Dawkins read the note and told Lloyd to report to Smiley Court. (Lloyd Dep. 68.)

Lloyd responded by saying that he got sick and had issues with tenants there. (*Id.* at 69.)

Dawkins asked him if he knew what insubordination was before repeating her order that

he report to Smiley Court. (*Id.* at 69–70.) She also asked him for a doctor's note about the

chicken plant making him sick. (Dawkins Dep. 20.)[2] Eventually Lloyd left, picked up his

tools from Gibbs Village West, and reported to Smiley Court later that morning. (Lloyd

Dep. 72–74.)

Lloyd worked at Smiley Court for the rest of the day on Monday, July 19. (Lloyd

Dep. 77). The next day, Tuesday, July 20, he called and made an appointment with Dr.

Hendon for the upcoming Friday. (Herndon Dep. 13–16.) Lloyd then worked the rest of

the day, suffering shortness of breath, having to use his inhaler multiple times, and

feeling like he had high blood pressure. (Lloyd Dep. 78.) Lloyd never returned to work

after that. (*Id.* at 101–02.)

On July 23, Lloyd saw Dr. Hendon as planned. (*Id.* 101–02.) The appointment

resulted in Dr. Hendon providing Lloyd with a number of doctor's notes that placed him

---

[2] At the time of Lloyd's request, the MHA had in place a policy requiring employees to support accommodation requests with medical evidence. (Hardwick Dep., Ex. 7 at 18.)

8

off from work. (Lloyd Dep., Ex. 9–11.) A few days later, Dr. Hendon had Lloyd in for a follow-up, which led to Hendon completing a medical certification indicating that Lloyd could not perform his job because of his medical condition. (Lloyd Dep., Ex. 8.) Dr. Hendon certified that Lloyd could not "tolerate sun & heat due to [elevated blood pressure], cannot tolerate cleaning chemicals due to asthma." (*Id.*)

The MHA approved Lloyd for leave under the Family and Medical Leave Act (FMLA) after receiving Dr. Hendon's note. This gave Lloyd up to twelve weeks off, depending on his doctor's orders. Even so, Lloyd resigned on September 9, 2010, telling the MHA he had to quit "due to continuous and numerous health issues that will prevent me from performing tasks within my job description." (Lloyd Dep., Ex. 7.) The Social Security Administration has since approved his claim for disability benefits. (Lloyd's SSA Records at 39–51.) And Lloyd maintains that he can no longer work: he has trouble standing for long periods, he cannot be around chemicals, he has difficulty with his mobility, and he cannot go up a ladder or pick anything up. (Lloyd Dep. 152–153, 156–57, 218.) As a result, the MHA has no jobs that he can perform given his limitations. (*Id.* at 219.)

### V. MOTION TO STRIKE DISCUSSION

The MHA asks the Court to strike portions of the affidavits of Danny Cook and Fredda Perryman, both of which were submitted by Lloyd. Cook's affidavit states that, in his opinion, the MHA transferred Lloyd to Smiley Court "for no good reason." (First

Cook Aff. at ¶ 4.) He also says, presumably referring to Lloyd's condition, that the smell

from the chicken plant would "especially affect someone who suffers from asthma." (*Id.*)

Finally, Cook's affidavit states that the MHA often transferred employees that it wanted

to get rid of without firing and that the relevant decision makers "would discriminate

against someone because they have a disability." (*Id.* at ¶¶ 5–6.) However, Cook recanted

most, if not all, of this testimony in a later-filed affidavit, explaining that Lloyd's lawyer

asked him to sign the first one and that he did so without reviewing it because he "was

rushing to return to work." (Second Cook Aff. at ¶ 3.)

Perryman's affidavit largely comports with Cook's first one. In her opinion, the

MHA transferred Lloyd to get rid of him after he filed a sexual harassment complaint.

(Perryman Aff. at ¶¶ 5, 8.) Perryman also testifies to the mental state of MHA's decision

makers (*id.* at ¶ 4), her belief about the cause of Lloyd's sickness (*id.* at ¶ 6), what Lloyd

told her about why he could no longer work (*id.* at ¶ 7), and how the MHA acts when it

wants to get rid of employees (*id.* at 8). She further states that Dawkins, Hardwick, and

Hester "are very mean spirited" and that she believes "they discriminated against Mr.

Lloyd because of his disability." (*Id.* at ¶ 11.) Lastly, according to Perryman, the three

women "knew [Lloyd] had asthma and that he could not work there, so he would have to

resign." (*Id.*)

Rule 56(c)(4) of the Federal Rules of Civil Procedure allows a party to submit an

affidavit supporting or opposing a summary judgment motion. But the document must

meet certain requirements: "[it] must be made on personal knowledge, set out facts that would be admissible evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). A district court must not consider an affidavit that falls below this standard as it has no probative value and should be struck. *United States v. Jones*, 29 F.3d 1549, 1554 (11th Cir. 1994); *Pashoian v. GTE Directories*, 208 F. Supp. 2d 1293, 1297 (M.D. Fla. 2002) ("An affidavit submitted in connection with a summary judgment motion is subject to a motion to strike if it does not meet the standards set forth under Rule 56 of the Federal Rules of Civil Procedure.").

Most of Cook's first affidavit is due to be struck. He makes a number of assertions requiring scientific knowledge (like the effect fumes from a chicken plant would have on someone with asthma), and he fails to demonstrate the personal knowledge necessary to make certain assertions (for example, his claims about how the MHA transfers employees to get rid of them and how they would discriminate against someone based on disability). Besides, his second affidavit recants some of these statements and makes clear that he rubber stamped an affidavit that he likely did not read and that was prepared by Lloyd's attorney. As a result, his first affidavit is due to be struck.

Most of Perryman's affidavit is due to be struck for similar reasons. A number of her assertions do not appear to be based on personal knowledge (for example, her contention that undisclosed MHA staffers knew about the fumes emanating from the chicken plant); do not meet the standard for lay opinion evidence (like her opinion about

the MHA's decision to transfer Lloyd); contain inadmissible hearsay ("[Lloyd] said that the odor outside made him sick."); and state legal conclusions (like her assertion that the MHA discriminates based on disability). Accordingly, the offending portions of her affidavit are likewise due to be struck, and the MHA's motion is due to be granted. The Court, however, will consider the portions of her affidavit which she bases on personal knowledge (such as her claim about the MHA trying to transfer her); those falling under a hearsay exception (like Lloyd telling her about his present physical condition, *see* Fed. R. Civ. P. 803(3)); or those meeting the standard for admissible lay opinion ("[Lloyd] was ill when he reported for work. His eyes were red, he looked weak and was about to pass out.").

## VI. SUMMARY JUDGMENT DISCUSSION

### A. Lloyd's ADA claim

The Americans with Disabilities Act (ADA) prohibits discrimination based on disability. To this end, the ADA bars covered employers from discriminating against "a qualified individual on the basis of disability" in the "terms, conditions, [or] privileges of employment." 42 U.S.C. § 12112(a) (2000) (amended 2008). The statute even "imposes upon employers the duty to provide reasonable accommodations for known disabilities unless doing so would result in undue hardship to the employer." *Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996).

Lloyd bears the burden of establishing a prima facie case of disability

discrimination. *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997). If he meets this burden, the MHA must then provide a legitimate, non-discriminatory reason for the challenged action. *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004). Should the MHA do so, the burden shifts once again to Lloyd, requiring him to produce substantial evidence that the MHA's proffered reason is a lie used to cover up intentional discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008); *Chapman v. AI Transport*, 229 F.3d 1012, 1024–25 (11th Cir. 2000).

### 1. Lloyd's initial burden

To establish a prima facie case, Lloyd must prove that "(1) he has a disability; (2) he is a qualified individual; and (3) he was subjected to unlawful discrimination because of his disability." *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). A person has a disability if he "has a physical or mental impairment that substantially limits one or more . . . major life activities." 42 U.S.C. § 12102(1)(A) (2000) (amended 2008); 29 C.F.R. § 1630.2(g) (2011). And "a qualified individual with a disability" is someone who can perform the "essential functions" of the job, "with or without reasonable accommodation." 42 U.S.C. § 12111(8). An employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide "reasonable accommodations" for the disability, unless doing so would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a).

As mentioned, a person has a disability if he has a physical impairment that

substantially limits one or more major life activities. The Equal Employment Opportunity Commission (EEOC) has defined a "physical impairment" as a "physiological disorder or condition . . . affecting one or more of the following systems: neurological, musculoskeletal, . . . *respiratory* . . . [and] *cardiovascular.*" 29 C.F.R. § 1630(h)(1) (emphasis added). Before a physical or mental condition crosses the rubicon from a mere impairment to a disability previously required courts to make reference to the corrective measures a plaintiff could use to offset the effects of the impairment. *See, e.g.*, *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). So under *Sutton*, common maladies like asthma and hypertension would not likely, if ever, render a plaintiff disabled because readily available, inexpensive medication ameliorates the symptoms of these impairments so they would not substantially limit a major life activity. *See, e.g.*, *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516 (1999) (holding employee not disabled due to high blood pressure where medication relieved his symptoms); *Webb v. Clyde L. Choate Mental Health & Dev. Ctr.*, 230 F.3d 991 (7th Cir. 2000) (finding asthma did not substantially limit a major life activity); *Gaddy v. Four B. Corp.*, 953 F. Supp. 331 (D. Kan. 1997) (holding employee with asthma not disabled because employee could successfully control condition with inhaler and breathing machine).

But the ADA Amendments Act of 2008 (ADAAA) rejected this approach. Now courts must inquire into whether an impairment substantially limits a major life activity "without regard to the ameliorative effects of mitigating measures." 42 U.S.C. §

14

12102(4)(E)(i). This includes medication, assistive technology, and reasonable accommodations. *Id.* § 12101(4)(E)(i)(I). The only exceptions are eyeglasses or contact lenses, the ameliorative effects of which courts must consider still. *Id.* § 12101(4)(E)(ii). In effect, these provisions require courts to look at a plaintiff's impairment in a hypothetical state where it remains untreated. In addition, the ADAAA rejected the Supreme Court's decision in *Toyota Motor Manufacturing v. Williams*, which held that the term "major life activities" referred only to activities of "central importance to most people's daily lives." 534 U.S. 184, 198 (2002). Under the ADAAA, "major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

At bottom, the expanded definitions of "disability" and "major life activities" mean that treatable yet chronic conditions like hypertension and asthma render an affected person just as disabled as a wheelchair-bound paraplegic—if only for the purposes of disability law. Yet the ADAAA left untouched the plaintiff's burden of proof in a disability case; he still has to prove he has a disability. The plaintiff thus bears the burden of producing evidence about how his condition would affect him if left untreated. A contrary rule would require courts to gaze into a crystal ball, put on a white coat, and divine how a given impairment would have affected the plaintiff had he decided to leave

it untreated.

Here, Lloyd has produced no evidence about whether his physical impairments—asthma and high blood pressure—substantially affected a major life activity before his transfer in July of 2010. In fact, the record makes clear that he did maintenance work for the MHA for 22 years without his alleged impairments causing a problem. Furthermore, Lloyd failed to produce evidence tending to prove how either impairment would have affected him in a hypothetical, untreated state. Indeed, Dr. Herndon never broached this subject during his deposition, nor did Lloyd make any arguments on this point in his brief. Hence he has failed to produce evidence that would allow a reasonable jury to conclude that he suffered from a disability before his transfer to Smiley Court.

The evidence about the effects of his condition after his transfer to Smiley Court are another matter. Dr. Hendon's FMLA certification showcases how Lloyd has both a respiratory condition (asthma) and a cardiovascular condition (high blood pressure) that amount to physical impairments. According to Dr. Hendon, Lloyd's asthma and hypertension limit his ability to work in the sun and around cleaning chemicals.[3] This testimony provides a reasonable jury with enough evidence to conclude that Lloyd's physical impairments substantially limit his ability to work, which is a major life activity

_____

[3] Dr. Hendon provided no medical analysis on this point. He simply took Lloyd at his word that his physical impairments all of sudden kept him from working in the sun or with cleaning chemicals. Yet the Court must construe the evidence in Lloyd's favor at the summary judgment stage and, as a result, must conclude that he produced sufficient evidence to create a genuine issue of material fact as to whether he was disabled after his transfer to Smiley Court.

under the ADAAA. His asthma, a juror could reason, makes it so that Lloyd can no longer work around cleaning chemicals. Similarly, a reasonable juror could find that his elevated blood pressure substantially limits his ability to work in the sun. Accordingly, Lloyd has carried his burden on the first element as it relates to the events occurring after his transfer to Smiley Court.

Since a reasonable juror could find Lloyd disabled, the Court turns to whether he has produced evidence that would allow a reasonable jury to conclude he is a qualified individual with a disability. A plaintiff meets this test if he can perform the essential functions of his job, with or without a reasonable accommodations. "Essential functions are 'the fundamental job duties of the employment position the [disabled employee] holds or desires.'" *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1258 (11th Cir. 2001) (quoting 29 C.F.R. § 1630(n)(1)). Dr. Hendon's note states that "[Lloyd] cannot tolerate sun & heat due to [high blood pressure,] & cannot tolerate cleaning chemicals due to asthma." (Lloyd Dep., Ex. 16 at 2.) These activities are essential job junctions for an MHA maintenance mechanic. Because Lloyd cannot perform the job's essential functions, he cannot make out a prima facie case of disability discrimination.

Equally important, Dr. Hendon's note neither ties Lloyd's disability to a specific MHA property (like Smiley Court) nor does it suggest that he could work elsewhere (like Gibbs Village West or Patterson Court). This makes an accommodation impossible: no maintenance job at the MHA allows a worker to avoid the sun, the heat, and the cleaning

17

chemicals used by maintenance mechanics. So the MHA could not have modified

Lloyd's job or transferred him to a more suitable locale; Lloyd actually admitted as much

during his deposition.[4] This failure further underscores Lloyd's inability to meet his

initial burden.

The next prong of Lloyd's prima facie case requires him to show a connection

between the adverse employment action and his disability. Because Lloyd voluntarily

resigned, he does not claim that the MHA terminated him unlawfully. So he instead

focuses on the MHA's decision to transfer him from his position at Gibbs Village West to

Smiley Court. His claim fails here too. Lloyd has produced no evidence showing that his

disability motivated the MHA's decision to transfer him.[5] Rather, the uncontradicted facts

show that the MHA transferred him to avoid potential liability for a quid pro quo sexual

harassment claim. The timing of Lloyd's transfer further highlights the non-

discriminatory nature of it: the MHA changed his work assignment right after the rumors

surfaced about Lloyd having a sexual relationship with Bell. Perhaps more importantly, it

is not clear that the transfer, in the context of an ADA claim, amounted to an adverse

employment action, because Lloyd had the same hours, pay, benefits, and responsibilities

---

[4] Lloyd stated:

> Q.     And with those limitations, there's no job you could perform at
>        the Montgomery Housing Authority?
> A.     No, sir.

(Lloyd Dep. 219.)

[5] Lloyd implicitly recognizes this in his response brief by focusing solely on his accommodation request.

at Smiley Court as he did at Gibbs Village West. (Lloyd Dep. 76.)

Yet the inquiry does not end here. Discrimination under the ADA includes not only adverse employment actions but also "not making reasonable accommodations" to a plaintiff's known disabilities. 42 U.S.C. § 12112(b)(5)(A); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998). Thus an ADA plaintiff can prove discrimination by way of his employer's failure to provide a reasonable accommodation. To do so, the plaintiff must identify a reasonable accommodation that would allow him to perform the job. *Terrell v. US Air*, 132 F.3d 621, 624 (11th Cir. 1998). "An employee with a disability is not entitled to the accommodation of his choice, but only to a reasonable accommodation." *McKane v. UBS Fin. Servs., Inc.*, 363 F. App'x 679, 681 (11th Cir. 2010) (quoting *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000)).

Lloyd claims the MHA should have accommodated him by assigning him somewhere besides Smiley Court. But this argument fails because he did not have a known disability prior to his transfer. Moreover, because his disability prevents him from doing his job even with an accommodation, the MHA has no duty to accommodate him under the ADA. Lloyd therefore cannot should his initial burden on this point either.

### 2. The MHA's legitimate, non-discriminatory reason

For the sake of argument, and out of an abundance of caution, the Court will continue analyzing Lloyd's ADA claim. After a plaintiff makes out a prima facie case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the

challenged action. To satisfy the burden of production, "[t]he defendant need not

persuade the court that it was actually motivated by the proffered reasons. It is sufficient

if the defendant's evidence raises a genuine issue of fact as to whether it discriminated

against the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55

(1981). "[T]o satisfy this intermediate burden, the employer need only produce admissible

evidence which would allow the trier of fact rationally to conclude that the employment

decision had not been motivated by discriminatory animus." *Id.* at 257. "This intermediate

burden is 'exceedingly light.'" *Holifield v. Reno*, 115 F.3d 1555, 1564 (11th Cir. 1997)

(quoting *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)).

Even if one assumes Lloyd shouldered his initial burden, the MHA offered a

legitimate, non-discriminatory reason for his transfer: it wanted to separate Lloyd from

Bell to avoid any potential liability in case it turned out that the two were actually having

an affair. This would help shield the MHA from sexual harassment liability under a quid

pro quo theory if the employer later fired Lloyd for an unrelated reason. The MHA thus

met its burden to proffer a legitimate, non-discriminatory reason for transferring Lloyd.

### 3. Lloyd's claim of pretext

To prove pretext, a plaintiff has to show that his "employer's explanation is

unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th

Cir. 2005) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). This

requires showing "*both* that the reason was false, *and* that discrimination was the real

reason" for the adverse action. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 512 n.4

(1993). A plaintiff may show pretext by pointing to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason, *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006), or by producing other evidence "which permits the jury to reasonably disbelieve the employer's proffered reason," *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003). "Any believable evidence which demonstrates a genuine issue of material fact regarding the truth of the employer's explanation may sustain the employee's burden of proof." *Steger*, 318 F.3d at 1079.

Lloyd contends that the MHA's reasons for transferring him amount to pretext because its own investigation "did not result in proof that there was an affair," thus making it "inconceivable that it would be concerned about liability." (Doc. # 33 at 16.) But just because the MHA had reason to believe that Lloyd and Bell never had an affair does not prohibit it from taking a proactive approach to managing its potential exposure. Employers in this day and age have a variety of local, state, and federal laws to contend with, many of which provide employees with a lucrative cause of action against their employers. That an employer chooses a conservative path in braving this legal and regulatory bramble bush—for example, by transferring an employee allegedly having an affair with a supervisor—does not, by itself, amount to pretext used to conceal a discriminatory motive. In other words, federal courts do not sit as a "super personnel department that will second-guess an employer's decisions," *Elrod v. Sears, Roebuck & Co.*, 939 F.3d 1466, 1470 (11th Cir. 1991), particularly difficult ones like deciding how

21

to handle rumors about a sexual affair between a supervisor and subordinate.

## B. Lloyd's retaliation claims

Contract law typically governs the relationship between employer and employee, and absent an agreement to the contrary, either party can terminate the relationship at will. This allows employers and employees the flexibility to end or make changes to the employment relationship without the threat of costly judicial intervention. *See, e.g.*, *Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006) (". . . he was an employee at will who could be fired for any reason not forbidden by the . . . law, such as failing to trim his mustache or eating with his fork in his left hand."); *see also Elrod*, 939 F.3d at 1470; *Alexander v. Cnty. of Fulton*, 207 F.3d 1303, 1341 (11th Cir. 2000) ("it is not the court's role to second-guess the wisdom of an employer's decisions so long as the decisions are not [impermissibly] motivated"). But as *Mattenson* suggests, the at-will rule is not without limits. One of these limits is Title VII, which cabins the default rule by barring certain types of discrimination. As a prophylactic measure, Title VII also bars an employer from retaliating against an employee who opposes, or participates in the investigation of, an employment practice made unlawful by the statute. 42 U.S.C. § 2000e-3(a).

To press a retaliation claim, a plaintiff must show that he opposed or participated in the investigation of an unlawful practice and suffered an adverse employment decision as a result. *Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 2009) (stating that plaintiff-employee must show "(1) he engaged in a statutorily protected activity; (2) he suffered an

adverse employment action; and (3) he established a causal link between the protected activity and the adverse action."). To prove this without direct evidence, a plaintiff must rely on a burden shifting approach. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, a retaliation plaintiff must state a facial case before the burden shifts to the defendant. *Bryant*, 575 F.3d at 1307. If the plaintiff bears his burden, a presumption arises that the defendant impermissibly retaliated, and the defendant then has to articulate a legitimate, non-retaliatory reason for the challenged employment action. *See id.* If the defendant can do so, it negates the plaintiff's facial case, and the plaintiff must then come forward with sufficient evidence for a fact finder to conclude that the employer's proffered reason served as pretext to conceal an impermissible motive. *Id.*

### 1. Lloyd's initial burden

As mentioned, Lloyd has to show that he complained of sexual harassment and suffered an adverse employment action as a result. The parties do not dispute that he engaged in statutorily protected activity. And with good reason: his complaint to the MHA's management about the rumor Cleveland started amounts to a complaint about sexual harassment by the employer's own terms. In fact, Lloyd learned that such rumors can constitute sexual harassment at an MHA workshop. Lloyd has thus satisfied the first element of his prima face case.

The next element requires the plaintiff to prove a materially adverse employment

action. To do so, the plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 60 (2006). This is a relatively liberal standard, especially compared to the Eleventh Circuit's prior rules requiring an "ultimate employment decision" or some other showing of substantiality to show an adverse employment action. *See, e.g.*, *Stravropoulos v. Firestone*, 361 F.3d 610, 616–17 (11th Cir. 2004); *Gupta v. Fla. Bd. Regents*, 212 F.3d 571, 587 (11th Cir. 2000); *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). Now, for example, a plaintiff can show that something as innocuous as an unfavorable performance review amounts to a materially adverse action. *See Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008).

Lloyd contends that his lateral transfer from Gibbs Village West to Smiley Court meets the *Burlington* standard. The Court agrees.[6] An employee gains an amount of certainty when assigned to a specific job location, certainty that he in turn relies on in arranging his day-to-day affairs. For instance, the employee knows when he needs to get up in the morning to make the commute, how much gas to buy to get there, what errands

---

[6] Notably, the *Burlington* test for material adversity is broader than the test for an adverse employment action because it reaches retaliatory actions that are neither employment related nor connected to the workplace. *See Washington v. Ill. Dep't of Rev.*, 420 F.3d 658, 661 (7th Cir. 2005) (stating lateral transfers almost never discriminatory but can be retaliatory). It is therefore possible for a given action to satisfy the retaliation test while simultaneously failing the test for an adverse employment action in the discrimination context. So while a lateral transfer could dissuade a reasonable worker from supporting a discrimination charge it is also possible for that same transfer to fall short of an adverse employment action under the ADA.

24

he can run given the shops and service providers in the area, and how to manage any parenting responsibilities. A transfer to another location, even if the job remains the same, can upset these reliance interests and thereby discourage a reasonable employee from complaining about sexual harassment. *Cf. Geleta v. Gray*, 645 F.3d 408, 411 (D.C. Cir. 2011) (finding a lateral transfer sufficient to support retaliation claim where plaintiff lost previous responsibilities as a result of the transfer). The evidence in this case—namely the note Lloyd gave to Dawkins—shows that he had at least some of these worries in mind when he requested to work at Patterson Court because it is close to his child's school. (Lloyd Dep., Ex. 1.) This would allow a reasonable juror to conclude that a transfer from Gibbs Village West to Smiley Court "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68.

Lloyd has also provided sufficient evidence on the third and final element of his prima facie case of retaliation. The MHA readily admits that it transferred Lloyd shortly after he complained of the rumors started by Cleveland about Lloyd having a sexual relationship with Bell. The MHA even admits that Lloyd's report about Cleveland sparked its decision to transfer him; it simply maintains that it had a legitimate reason for doing so. Lloyd has thus carried his burden of establishing a prima facie case of retaliation.

### 2. The MHA's legitimate, non-discriminatory reason

The MHA asserts that it had a legitimate, non-retaliatory reason for transferring Lloyd. The employer claims that it wanted to avoid the potential for liability if the rumors about Lloyd and Bell sleeping together proved true. This is a legitimate reason. An employer faces strict liability for sexual harassment when a supervisor requires sexual favors as quid pro quo for job benefits. *See, e.g.*, *Meritor Savs. Bank FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989). So it makes sense that an employer would want to separate a supervisor and subordinate who are allegedly sleeping together. Doing so would mitigate the potential for liability—the supervisor would no longer have authority over the subordinate, thereby making it harder if not impossible for her to trade job benefits for sexual favors. The MHA has thus met its burden by offering a legitimate, non-discriminatory reason for the challenged action.

### 3. Lloyd's claim of pretext

Much of Lloyd's argument about pretext revolves around his contention that the MHA should have accommodated him. This conflates the two issues in this case. The MHA had no duty to accommodate his transfer request under retaliation law. Nor did it have to consider his request for a transfer to a different location, because a transfer is either retaliatory or it isn't. The ultimate destination is only relevant to the extent it sheds light on the employer's motive for taking the adverse action.

More importantly, once an employer articulates a legitimate, non-discriminatory

reason for the contested action, the employee has to "meet that reason head on and rebut it, . . . the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000) (citing *Alexander v. Cnty. of Fulton*, 207 F.3d 1303, 1341 (11th Cir. 2000)); *see also Johnson v. Rice*, 237 F. Supp. 2d 1330 (M.D. Fla. 2002) (stating plaintiff's "gut feeling" transfer was retaliatory does not suffice). Lloyd attempts to rebut the MHA's reason by again arguing that since the MHA's investigation failed to produce proof of an affair, "it is inconceivable that it would be concerned about liability." (Doc. # 33 at 27.) To him, "[c]learly the Authority's reason, that it moved Mr. Lloyd to avoid liability because of the supervisory relationship between Ms. Bell and Mr. Lloyd, was pretextual." (*Id.*)

For the reasons discussed above, this assertion does not suffice to rebut the MHA's legitimate, non-discriminatory reason. Quite to the contrary, it was an arguably reasonable way for the MHA to try to innoculate itself against a future lawsuit and minimize its potential exposure under a quid pro quo theory of liability. Because Lloyd has done nothing more than question the wisdom of this decision, he has failed to meet his burden of producing evidence showing that the MHA's legitimate, non-discriminatory reason amounts to pretext used to conceal an impermissible motive. As a result, the MHA is entitled to summary judgment on his retaliation claim as well.

## VII. CONCLUSION

After having fully considered the parties' briefs, and for the reasons discussed

above, it is hereby ORDERED as follows:

1.      The MHA's Motion for Summary Judgment (Doc. # 29) is GRANTED.

2.      The MHA's Motion to Strike (Doc. # 35) is GRANTED IN PART and
        DENIED IN PART.

3.      The pretrial hearing scheduled for May 1, 2012 (*see* Doc. # 40), is
        cancelled.

Done this the 27th day of April, 2012.

                                    /s/ Mark E. Fuller
                          UNITED STATES DISTRICT JUDGE

28